HAHsPHOc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    PHOENIX FEELEY,

4            Plaintiff,

5        v.                15 Civ. 8349 (PKC)

6    CITY OF NEW YORK, et al.,

7            Defendants.

8    ------------------------------x
                         New York, N.Y.
9                      October 17, 2017
                     3:15 p.m.
10

11    Before:

12               HON. P. KEVIN CASTEL,

13                      District Judge

14            APPEARANCES

15    JEFFREY A. ROTHMAN
      Attorney for Plaintiff

16    NEW YORK CITY LAW DEPARTMENT
      Attorneys for Defendants
17    BY: EVAN C. BRUSTEIN

18

19

20

21

22

23

24

25

HAHsPHOc

```
 1              (Case called)

 2              MR. ROTHMAN:  Good afternoon, your Honor.  Jeffrey

 3    Rothman on behalf of the plaintiff, Phoenix Feeley.

 4              How are you?

 5              THE COURT:  Good afternoon, Mr. Rothman.

 6              For the defendant.

 7              MR. BRUSTEIN:  Evan Brustein for the defendant, your

 8    Honor.

 9              THE COURT:  Good afternoon, Mr. Brustein.

10              Let me go through the in limine motions.  First of

11    all, the plaintiff moves in limine to exclude references to

12    other lawsuits that the plaintiff has filed and complaints the

13    plaintiff has filed against members of the NYPD.

14              What does that have to do with anything in this case?

15              MR. BRUSTEIN:  Your Honor, I think that one of the

16    things that it could have to do with is if the plaintiff

17    testifies in a certain way, it could go to show her bias

18    towards police officers.  It could also go to the credibility

19    of her argument in this matter.

20              THE COURT:  Well, tell me about the credibility of her

21    argument in this matter.  How does the fact that she filed

22    other lawsuits have to do with her credibility in this matter?

23              MR. BRUSTEIN:  The fact that the plaintiff has filed

24    other lawsuits and received money for it could be a motivating

25    factor in her making more of a situation than it actually was.
```

HAHsPHOc

```
 1          THE COURT:  Your view is that if a person was the

 2   subject of some type of police misconduct, it wasn't dismissed

 3   by the court as frivolous, it wasn't rejected by a judge or a

 4   jury, but the officers agreed to settle, that that somehow

 5   undermines the plaintiff's credibility in this case --

 6          MR. BRUSTEIN:  Well --

 7          THE COURT:  -- as to a subsequent act which the

 8   plaintiff believes is police misconduct?

 9          MR. BRUSTEIN:  I would disagree with your Honor's

10   characterization of being subject to police misconduct because

11   that implies that there actually was misconduct as opposed to

12   just an allegation.

13          THE COURT:  There was an allegation that was settled

14   with a payment of money, correct?

15          MR. BRUSTEIN:  Yes, your Honor.

16          THE COURT:  And your point is, if I understood it, it

17   is the very fact that money was paid that makes it relevant?

18   In other words, presumably something more than $250, right?

19          That is what makes it relevant, that she made money

20   from the prior loss.  Isn't that what you're asserting?

21          MR. BRUSTEIN:  In part.

22          THE COURT:  Well, what is the other part?

23          MR. BRUSTEIN:  Well, plaintiff has also been

24   interviewed online repeatedly talking about her other lawsuits

25   and seeking money from the public to pay her attorneys' fees
```

HAHsPHOc

| | |
|---|---|
| 1 | for those lawsuits. |
| 2 | THE COURT:  Right. |
| 3 | MR. BRUSTEIN:  The fact that she has made that a |
| 4 | public issue -- |
| 5 | THE COURT:  Right.  Go ahead. |
| 6 | MR. BRUSTEIN:  -- does go to her credibility? |
| 7 | THE COURT:  How? |
| 8 | MR. BRUSTEIN:  How does the fact that she is claiming |
| 9 | that she needs to pay for her attorney fees on lawsuits -- I'm |
| 10 | not sure how that wouldn't go to her credibility.  The fact |
| 11 | that she is trying to -- |
| 12 | THE COURT:  I'm sorry, sir.  You haven't persuaded me |
| 13 | that it goes to her credibility.  She says, I have been |
| 14 | victimized by the police not once, but multiple times, and I |
| 15 | have been wronged.  Apparently, from what you're telling me, |
| 16 | the whole theory of your motion or a theory of your motion is |
| 17 | that because she is paid money by the officers, it was not |
| 18 | dismissed by a court or rejected by a jury as frivolous, but |
| 19 | the officers paid money to settle the suit shows somehow that |
| 20 | she views this as a way to make money or some such thing, that |
| 21 | and collected money from the public.  How is that relevant? |
| 22 | MR. BRUSTEIN:  It is completely contradictory the fact |
| 23 | that she would settle a case where it would cover her |
| 24 | attorneys' fees, and then publicly say, I need money to pay for |
| 25 | my attorneys' fees.  That's completely -- one of them must be |

HAHsPHOc

1    false.

2            THE COURT:  So you're saying she lied to somebody?

3            MR. BRUSTEIN:  I am saying that, in her request

4    outward of the public for money for attorneys' fees, the tact

5    that she has settled her cases, which cover attorneys' fees,

6    would mean that she is lying to the public about her

7    interactions and, therefore, it does go to her credibility.

8            THE COURT:  Let's say a 1983 action is settled for

9    $4,000 including attorneys' fees.  Is not the plaintiff's

10   counsel entitled, if he has a retainer agreement, for one third

11   of that amount?  Isn't he entitled to one third of that amount?

12           MR. BRUSTEIN:  I'm not sure how him being entitled to

13   one third of that amount would mean that she would then need to

14   go to the public and get money to pay her attorneys' fees.

15   Because by that logic, the plaintiff would have received

16   approximately $2,600 or $2,700 and her attorney would have

17   received $1,300.

18           THE COURT:  She's out the $1,300.  Somebody concluded

19   that the value of the claim was $4,000.  She is out $1,300 that

20   she has to pay.  Now, the city may have only given the

21   plaintiff $600 on the attorneys' fee award.  The city doesn't

22   necessarily pay a one-third contingency.  The hours put in the

23   case and the retainer agreement don't need to match up.  Right?

24           MR. BRUSTEIN:  Your Honor, I am not privy to what her

25   attorney --

HAHsPHOc

| | |
|---|---|
| 1 | THE COURT:  I know you're not. |
| 2 | MR. BRUSTEIN:  Retainer agreement. |
| 3 | THE COURT:  I know you're not. |

4          MR. BRUSTEIN:  However, I think that makes it all the

5    more relevant whether or not her attorney, who in this case one

6    of his motions is to prevent him from being brought into this,

7    whether he is making her owe money beyond whatever her

8    settlements are such that she needs to go out to the public

9    with an open hand saying, pay me my money because whatever I

10   got wasn't enough.

11          THE COURT:  You lost me.  A retainer agreement is

12   entered into before the lawsuit is filed, presumably, correct?

13          MR. BRUSTEIN:  Yes, your Honor.

14          THE COURT:  Then there is a settlement.  In

15   settlement, the city does not take account of the retainer

16   agreement, it doesn't even know what it is, right?

17          MR. BRUSTEIN:  Correct.

18          THE COURT:  It may be that the attorneys' fee

19   component of the settlement is greater than the retainer,

20   correct, or it may be less than the retainer, right?

21          MR. BRUSTEIN:  Well, if that were the case, your

22   Honor, then that would also say something about the merit of

23   the claim, that the plaintiff is agreeing to settle at a loss

24   to herself.

25          THE COURT:  Let me see whether I have this correct.

HAHsPHOc

1   You think in a civil trial in a federal court that you're

2   entitled to bring out what claim was brought, prior lawsuits,

3   how much it was settled for, and how much her attorney was paid

4   for that lawsuit, that's what you're urging on this court?

5        MR. BRUSTEIN:  No, your Honor.  I don't believe that

6   we're trying to go to that extent.

7        THE COURT:  Well, what are you trying to do?  What am

8   I missing?

9        MR. BRUSTEIN:  I think we should be able to say that

10  she has made allegations against other police officers.  I

11  think the fact that --

12        THE COURT:  Well, listen, has there been any finding

13  that she lied in any of these allegations?

14        MR. BRUSTEIN:  I don't believe that the system is set

15  up to make a finding of a liar as part of these claims.  That

16  is not what the purpose of these claims are.

17        MR. ROTHMAN:  It would be adjudicated to be baseless.

18        MR. BRUSTEIN:  I don't believe that I can speak

19  educatedly to say that any of them were found to be baseless,

20  your Honor.

21        THE COURT:  All right.

22        MR. BRUSTEIN:  I don't know definitively that it is

23  the case that none of them were, but I can't speak to that

24  point.

25        THE COURT:  Well, you come back and you tell me if you

HAHsPHOc

 1   have a judicial finding, and we'll talk about what the meaning

 2   of that is.  But the mere fact that a person claims that they

 3   had their rights violated by the police in one event and also

 4   determined or believed that their rights were violated on an

 5   earlier occasion, plus which the fact that it was an earlier

 6   occasion where the police officers paid money.  I don't see

 7   where that affects the plaintiff's credibility.  That is

 8   denied.

 9            Now let's talk about convictions and topless activism.

10            MR. ROTHMAN:  Judge, just to clarify, that was my

11   motion.  If I am understanding you, that was that motion is

12   granted?

13            THE COURT:  That is granted.

14            The next motion is with regard to two prior, they're

15   called convictions for indecent exposure and topless activism.

16            What were the convictions?

17            MR. BRUSTEIN:  Your Honor, I believe they fell with --

18   and Mr. Rothman can correct me if I am wrong -- I believe they

19   were toplessness in New Jersey.

20            THE COURT:  In New Jersey?

21            MR. BRUSTEIN:  Yes, your Honor.

22            THE COURT:  Were they misdemeanors or felonies or --

23            MR. BRUSTEIN:  I believe that they were either

24   misdemeanor or violations.

25            THE COURT:  Is the violation a crime?

HAHsPHOc

1          MR. BRUSTEIN:  No, your Honor.

2          THE COURT:  So what do you want to do with these?

3          MR. BRUSTEIN:  Your Honor, I'm not seeking to

4     introduce the fact that she was convicted for being topless.

5     However, in one of those instances, the plaintiff did undergo

6     a 15-day hunger strike because she didn't want to pay a fine

7     associated with that conviction.

8          THE COURT:  OK.

9          MR. BRUSTEIN:  In our case, she paid a fine for a

10    traffic ticket, so I do think the fact that she's been willing

11    to do a 15-day hunger strike is relevant; one, for chilling

12    speech factor to show that she is someone of great servitude

13    and is not willing to back down easily, and two, that she

14    doesn't pay for things that she doesn't believe she should have

15    to pay for, such that she is willing to undergo a 15-day hunger

16    strike, which is in direct contrast --

17         THE COURT:  Was she obligated to pay?

18         MR. BRUSTEIN:  Yes.

19         THE COURT:  All right.

20         MR. BRUSTEIN:  We have no objection to not mentioning

21    the basis for the conviction or even using the word conviction,

22    if we just were to say that she had a fine, and rather than pay

23    the fine, she remained on a 15-day hunger strike and refused to

24    pay the fine, something --

25         THE COURT:  This has no relevance to the excessive

HAHsPHOc

1   force claim, is that what you're saying?

2           MR. BRUSTEIN:  Correct, your Honor.  This has to do

3   with the chilling speech and the fact that she is claiming

4   that -- I believe they're arguing that she paid the ticket for

5   no reason.  It would go to credibility as well, if she makes

6   that argument.

7           THE COURT:  I understood the premise of Mr. Rothman's

8   motion is he doesn't plan to mention this at all, am I correct?

9           MR. ROTHMAN:  I'm sorry, Judge.  What's the question?

10          THE COURT:  Are you planning on mentioning this?

11          MR. ROTHMAN:  Not at all.

12          THE COURT:  This conviction?  New Jersey.

13          MR. ROTHMAN:  Not at all.  It doesn't have the

14   slightest thing to do with anything.

15          MR. BRUSTEIN:  I meant the parking ticket, your Honor.

16   I apologize.  In this instance, there is a parking ticket.

17          THE COURT:  I understand that.  I understand there is

18   a parking ticket here.

19          MR. BRUSTEIN:  That is what I meant by ticket.

20          THE COURT:  What about it?  What about the ticket

21   here?

22          MR. BRUSTEIN:  I think the manner in which she handled

23   these two different tickets in 180-degree differences is

24   relevant.  I think it is something that a jury could consider

25   for her credibility if she takes the stand and says, look, it

HAHsPHOc

1    wasn't a big deal for me to pay this ticket.  I paid the fine

2    even though I didn't do anything wrong, when in a completely

3    different situation, she is going to not eat food for 15 days.

4    I mean, this is not just ignoring the ticket, this is actually

5    a physical protest of, you know, super human features.

6         I think that the two are something that should be put

7    side by side to gauge the credibility of I wasn't double

8    parked.  I would further state that in plaintiff's exhibit --

9    the video, Plaintiff's Exhibit D, she talks about how the fact

10   that she's given a ticket for no reason and she wasn't double

11   parked, then she turns around and pays the ticket.

12        I think the fact that they are trying to put forth

13   evidence that she wasn't double parked and yet she is paying

14   for a ticket that she is claiming is wrong, I think that --

15        THE COURT:  What was the fine for in New Jersey, sir?

16        MR. BRUSTEIN:  What was the fine for?

17        THE COURT:  Yes, sir.

18        MR. BRUSTEIN:  I believe it was in connection with

19   the -- I don't believe the term was a violation, but the

20   offense that she committed for being topless.

21        THE COURT:  All right.  Isn't it possible that

22   somebody could view one matter a principle and the other just a

23   double parking ticket, not a matter of principle?

24        MR. BRUSTEIN:  I think that is completely up to the

25   jury to decide whether they think that is to be the case or

HAHsPHOc

1    not.  I think that is something you should be able to present.

2            THE COURT:  Well, you may not refer to it.  You may

3    renew your application before you begin cross-examination, and

4    I'll consider whether or not it has some relevance to the First

5    Amendment retaliation claim, but otherwise, no mention can be

6    made without a prior order from me.  Understood?

7            MR. BRUSTEIN:  Yes, your Honor.

8            Just one clarification on that.  Is it only limited to

9    the First Amendment, or can it be renewed with respect to

10   credibility in general?

11           THE COURT:  No.  That position, in my view, is without

12   merit.

13           MR. BRUSTEIN:  Thank you, your Honor.

14           THE COURT:  Prior awards and commendations.

15           I gather the defendant will not elicit testimony

16   regarding any awards and commendations received by Officer

17   Urena, is that correct?

18           MR. BRUSTEIN:  Yes, your Honor.

19           THE COURT:  All right.  Let me ask Mr. Rothman, why is

20   the outcome of the parking ticket irrelevant?

21           MR. ROTHMAN:  Your Honor, it is not disputed that she

22   received the parking ticket.  It is not disputed she was

23   unhappy about receiving a parking ticket.  It is not disputed

24   that she complained to Officer Urena that he shouldn't give it

25   to her, and she thought it was unjust that he gave it to her.

HAHsPHOc

1          But what happened thereafter, after the incident was

2     over with regard to the parking ticket, it has just got nothing

3     to do with the question of what he did at the scene or didn't

4     do to her at the scene, whether he smashed his body into her or

5     not.

6          THE COURT:  But you have listed as one of your

7     exhibits in your case in chief the disposition sheet for the

8     ticket?

9          MR. ROTHMAN:  Yes, I did that only contingent on the

10    fact that my motion to keep that out would not be granted.  If

11    your Honor denies my motion to keep that out, I will introduce

12    it in my case in chief and ask her, you got the ticket, yes;

13    you paid for the ticket, yes.

14         THE COURT:  She is not going to offer the video in

15    which she claims the video was improperly issued?

16         MR. ROTHMAN:  The video will be presented.

17         THE COURT:  Including that assertion?

18         MR. ROTHMAN:  That assertion is on the video.

19         THE COURT:  That's the question I'm asking you.

20         MR. ROTHMAN:  Yes.  I mean, unless we want to splice

21    out part of the video.  That is what I'm saying, there is no

22    issue that she, at the time she was having the interaction with

23    Urena, was upset that she was getting a ticket and was

24    complaining that she thought was unfair.

25         As you mentioned, people pay parking tickets all the

HAHsPHOc

1     time.  I've gotten angry about a parking ticket, but I didn't

2     have enough time to go down there and fight it.  I write a

3     check and pay the parking ticket.

4              THE COURT:  In the ordinary situation, if in this case

5     you came in and you said, so she got a parking ticket.  That's

6     not what this case is about; her getting a parking ticket or

7     not getting a parking ticket.

8              This is about the excessive force, right?

9              MR. ROTHMAN:  Correct.

10             THE COURT:  That would be a different situation, but

11    that is not what you're doing.  If you put before the jury her

12    factual assertion that the issuance of the parking ticket was

13    improper, it seems to me that opens the door.  The jury should

14    not be left with the impression that the police officer gave an

15    improper ticket.

16             MR. ROTHMAN:  Your Honor, then before we filed the

17    JPTO, I offered to stipulate, in the event that this motion was

18    not granted, as follows.  I offered the following stipulation.

19             THE COURT:  Right.

20             MR. ROTHMAN:  It is stipulated between the parties

21    that Officer Jurena issued plaintiff a parking ticket for

22    double parking on July 24, 2014, in the vicinity of East 12th

23    Street in Manhattan, between avenues A and B and that plaintiff

24    pled guilty to double parking and paid a $115 fine, plus a $60

25    penalty and $2.06 interest in conjunction thereto to resolve

HAHsPHOc

1    the ticket.

2           That was in the event your Honor denied my motion,

3    which it seems that you wish to do.  I just don't want to get

4    off into --

5           THE COURT:  How does that sound to the defendant?

6           MR. BRUSTEIN:  It sounds like if that is the

7    stipulation, then the document itself is the better evidence

8    and the jury should be permitted to see the document.

9           THE COURT:  Do you have a problem with the

10   stipulation?

11          MR. BRUSTEIN:  Let me just look at the document,

12   your Honor.

13          THE COURT:  Take your time.

14          (Pause)

15          MR. BRUSTEIN:  Your Honor, this document says that a

16   hearing was held and that plaintiff was found guilty, which is

17   different than the fact that the plaintiff pled guilty.  I

18   would submit that that is a significant difference.

19          MR. ROTHMAN:  I don't remember from her deposition

20   testimony.

21          THE COURT:  See if you can work this out in the

22   stipulation, whatever is accurate.

23          You don't have any problem stipulating to the accurate

24   facts, do you?

25          MR. BRUSTEIN:  I don't want to sound overly cautious,

HAHsPHOc

```
 1    your Honor.  If I can respond to you with just some time.  I
 2    need to just confer before committing to that.
 3             THE COURT:  Who do you propose to confer with, if I
 4    may ask?
 5             MR. BRUSTEIN:  I would like to speak to a supervisor
 6    before doing that, your Honor.
 7             THE COURT:  Why don't you do that.  For the time
 8    being, don't refer to the disposition sheet until this is
 9    sorted out.
10             Now, you're proposing to call Marthar, defendants are,
11    is that correct?
12             MR. BRUSTEIN:  Yes, your Honor.
13             THE COURT:  Did you identify him in your 26(a)(1)
14    disclosures?
15             MR. BRUSTEIN:  Not by name, your Honor.  However, the
16    911 call did contain his phone number and identified him as the
17    male caller.
18             THE COURT:  Tell me what your 26(a)(1) disclosure
19    said.
20             MR. BRUSTEIN:  Your Honor, I apologize.  I don't have
21    that document.
22             THE COURT:  All right.
23             MR. BRUSTEIN:  I can tell you --
24             THE COURT:  Go ahead.
25             MR. BRUSTEIN:  -- that in our response to the
```

HAHsPHOc

```
1   discovery demands, we stated on July 13, 2016, the unnamed male

2   caller and NYPD event chronology, dated July 24, 2014, was how

3   we identified him in response to plaintiff's demand for the

4   identities of civilians who witnessed the incident.

5           THE COURT:  You identified him as who?

6           MR. BRUSTEIN:  The unnamed male caller.

7           THE COURT:  Mr. Rothman, why didn't you take the

8   deposition of the unnamed male caller?

9           MR. ROTHMAN:  Hard to find him.

10          THE COURT:  OK.

11          MR. BRUSTEIN:  Except for the fact that his phone

12  number was provided.

13          Your Honor, respectfully, we didn't have his name

14  until the day that I turned it over to Mr. Rothman.

15          THE COURT:  But Mr. Rothman was supposed to have his

16  name prior to that date.

17          Is that your argument, that because there was a phone

18  number, you didn't have his name, but Mr. Rothman should have

19  his name?  Is that what your argument is to me?

20          MR. BRUSTEIN:  My argument is he could have had his

21  name.

22          THE COURT:  So could you then.  No?

23          MR. BRUSTEIN:  Yes.

24          THE COURT:  But you didn't?

25          MR. BRUSTEIN:  That is correct.
```

HAHsPHOc

1      THE COURT:  You identify him as an unnamed caller,

2   right?

3      MR. BRUSTEIN:  Who had witnessed the incident.

4      THE COURT:  The way Mr. Rothman should have gotten the

5   name is picked up the phone, dial the number and say, Hello, my

6   name is Rothman.  I'm an attorney suing somebody.  Who are you?

7   Is that the conversation?

8      MR. BRUSTEIN:  That's what I did, your Honor.  I

9   didn't use his name, and I didn't say I was suing someone.  I

10   did call that number and that is how I did get Mr. Marthar's

11   name.  I don't think that to suggest that he could have done

12   that is improper.

13      THE COURT:  I am not saying it is improper, but one

14   would suppose that Mr. Marthar would have more of a

15   predilection to be open to an inquiry from the defendants in

16   this case than from the plaintiff in this case, considering the

17   fact that he told 911 he was assaulted by the plaintiff, right?

18      Here is what I am going to do.  You have to produce

19   Marthar for a two-hour deposition and you have to do it in the

20   next two weeks.  If it's got to be more time, then you'll get

21   back to me.

22      MR. ROTHMAN:  Your Honor, if I may be hard to make a

23   record?

24      THE COURT:  Yes.

25      MR. ROTHMAN:  It wasn't just because I didn't know who

HAHsPHOc

1    he was that I didn't seek to depose him at that point.  There

2    is a marked distinction between 26(a) initial disclosures and

3    responses to interrogatory requests.  What the 26(a)

4    disclosures state are the witnesses, upon whom that party

5    intends to rely either at summary judgment or at trial, which

6    indicates that the person should be deposed.  If that is not

7    indicated and it is just somebody who is identified in response

8    to an interrogatory, there is no reason to think the person

9    should be deposed in the course of discovery.

10          I think it's not proper for the defendants to do this

11   at this point when discovery has been closed a long time.  We

12   have had a summary judgment motion.  The summary judgment

13   motion has been denied.  We are presumably, today, going to be

14   picking a trial date and soon going to trial.  I don't think

15   discovery should be reopened with whatever potential can of

16   worms comes from Mr. Marthar's deposition.

17          The defendants are experienced counsel.

18   Mr. Brustein's predecessor was a senior counsel.  Mr. Brustein

19   is a senior counsel.  The law department deals with this

20   discovery all the time.  They know what their duty is to

21   disclose promptly witnesses upon whom they intend to rely.  The

22   first time I got this individual's name --

23          THE COURT:  Was September 6, correct?

24          MR. ROTHMAN:  Oh, no, no.  It was this year, just this

25   fall.

HAHsPHOc

1          THE COURT:  September 6.

2          MR. ROTHMAN:  September 6, yes.  I'm sorry, yes.

3          THE COURT:  That's what I thought.

4          MR. ROTHMAN:  Yes.

5          THE COURT:  OK.

6          MR. ROTHMAN:  I would respectfully request, as I said,

7     that the witness be barred from testifying at the trial.  If

8     your Honor, however, is going to have the deposition be taken,

9     I think it should be taken at the defendant's cost.  I, of

10    course, also don't have this individual's address.  I did try

11    and call him in September.

12         THE COURT:  Defendants will have to provide you with

13    that information.  They have an option.  They can either

14    produce him so you can take the deposition or furnish you with

15    his last known address so you can serve the subpoena.

16         I have considered the factors in <u>Patterson v.</u>

17    <u>Balsamico</u>, 440 F.3d. 104, 117 (2d Cir. 2006), each of the four

18    discretionary factors, and they have guided my exercise of

19    discretion in this.

20         If you want to extend it out to 21 days, that's it,

21    but let me tell you how this works for the City.  Today is

22    Tuesday.  By Friday, you'll tell Mr. Rothman that you will

23    produce him and give him a couple dates for a two-hour

24    deposition or by Friday you will give him the address of this

25    individual so that he can issue a subpoena.

HAHsPHOc

1              MR. BRUSTEIN:  Understood, your Honor.

2              THE COURT:  Thank you.

3              MR. BRUSTEIN:  Your Honor.

4              THE COURT:  Yes.

5              MR. BRUSTEIN:  I just wanted to return to the parking

6    ticket disposition.

7              THE COURT:  Yes.  I think you told me you need to talk

8    to some supervisor.

9              MR. BRUSTEIN:  I just --

10             THE COURT:  Have you spoken to the supervisor?

11             MR. BRUSTEIN:  Yes, your Honor.  I am prepared to

12   enter into a stipulation with Mr. Rothman about that.

13             THE COURT:  OK.  When did you talk to the supervisor?

14             MR. BRUSTEIN:  I sent an e-mail, your Honor.

15             THE COURT:  All right.  In any event, that's happy

16   news.

17             Let's talk about the redaction.  What do you want to

18   redact, Mr. Rothman, or what are you objecting to as a

19   redaction?  Explain the redaction issue.  This has to do with

20   Marthar statements made during the 911 call.

21             MR. ROTHMAN:  If, in fact, those were Marthar's

22   statements, this refers to the summary of those statements by

23   an unknown 911 operator, who was not taking things down

24   verbatim, but was making a notation to a police officers in the

25   field about what might be go on so that they can go to that

HAHsPHOc

1   scene --

2         THE COURT:  This was a written communication to

3   officers that day?

4         MR. ROTHMAN:  I believe that's how it works.  I

5   believe the 911 operator sits somewhere, speaks with a caller,

6   and then enters their summary of what is being said and/or they

7   their take on what the officers should do.  It is not a

8   verbatim recording of what Marthar said, and it is a hearsay

9   statement by an unknown individual that may or may not be a

10  summary of something that Marthar said.

11        THE COURT:  The important point, Mr. Rothman, is that

12  first of all, it is not offered for the truth of its content

13  that there is an assault in progress, and it doesn't even

14  matter whether it was Marthar or an imposter or a

15  mischief-maker.

16        The fact of the matter is, it went out to the officers

17  and that's the information they had when they responded to the

18  call.  That seems to me pretty relevant to the reasonableness

19  of the seizure.

20        MR. ROTHMAN:  Your Honor, once again, it's been a

21  while since the oral argument in the case.  The fact issue at

22  trial is whether or not Officer Jurena, with regard to the

23  excessive force, also with regard to all the other claims,

24  whether or not he smashed his body into her.  He denies ever

25  doing it.  That's the primary issue.

23

HAHsPHOc

1           It is not denied he showed up at the scene and it is

2    not denied or I am not asking the jury not be told that he came

3    in response to a radio call, but it is of zero relevance why,

4    with respect to the content of the radio call that he responded

5    to.

6           THE COURT:  Why is that?

7           MR. ROTHMAN:  How could --

8           THE COURT:  If you're responding to a call that is put

9    out as assaultive conduct is in progress, your mindset, I would

10   hope, as an officer, would be quite different than if it were,

11   you know, a sick person needing an ambulance or a cat in a

12   tree.

13          MR. ROTHMAN:  That might have some relevance if the

14   officer was saying, Yeah, I smashed into her, but here is why I

15   did it.  I had thought that she was potentially dangerous, X,

16   Y, Z.

17          THE COURT:  He doesn't have to testify.

18          MR. ROTHMAN:  Pardon me?

19          THE COURT:  He doesn't have to testify.

20          MR. ROTHMAN:  I am calling him as a witness on

21   plaintiff's case in chief.

22          THE COURT:  The fact of the matter is, he is allowed

23   to say on examination, well, I believed I was responding to an

24   assault in progress.  You seem to think that that is irrelevant

25   and I don't agree with you.

24

HAHsPHOc

1        MR. ROTHMAN:  OK.

2        THE COURT:  All right.  By the way, you can take a

3   look at Graham v. Connor, 490 U.S. 386, 397 and U.S. v.

4   Volkell, 251 F.2d 333, 336.

5        MR. ROTHMAN:  With regard to Graham -- I am not

6   familiar with the second one.  Graham, of course, I have some

7   familiarity with.

8        THE COURT:  Right.

9        MR. ROTHMAN:  That relates to justifications for use

10  of force.  Again, the fundamental fact dispute of the trial is

11  whether or not any force was used.  He denies doing anything

12  more than possibly slightly brushing against her.  So it is not

13  the question of, well, he thought he might have been dealing

14  potentially with an assaultive person at the scene.  He denies

15  smashing into her.

16        THE COURT:  Thank you.

17        MR. ROTHMAN:  I don't see how the mindset of

18  potentially dealing with an assaultive situation could be

19  relevant to this particular case and these particular facts.

20        THE COURT:  Thank you.

21        MR. ROTHMAN:  Thank you.

22        THE COURT:  With regard to the defendants' motions in

23  limine, you're not going to refer to the defense counsel as

24  city attorneys, correct?

25        MR. ROTHMAN:  Your Honor, I hadn't really thought

HAHsPHOc

1    about how I was going to particularly refer to them.

2              THE COURT:  Defendant's counsel.

3              MR. ROTHMAN:  Assistant corporation counsel.

4              THE COURT:  That is unnecessary.  You mean if they

5    came from a Cravath, Swaine & Moore, you would refer to them as

6    the Cravath lawyers.  They're the defendant's lawyers.  Why

7    would you want to throw that in there?

8              MR. ROTHMAN:  I mean, I refer to them as all sorts of

9    things and sometimes just --

10             THE COURT:  I bet you do.  I bet they refer to you the

11   same way.

12             MR. ROTHMAN:  Well, I wouldn't doubt that, but what I

13   am saying is that sometimes that role is naturally after the

14   tongue and I don't want to have any head in the gear team

15   because it happens to be factually true.

16             What I presented in some detail in my papers is that

17   the retainer agreements between officers and the law

18   department, where it states specifically that the officers are

19   subordinating their personal interest to that of the City, the

20   City's primary interest is to the City.  In order for the

21   officers to be represented and to be indemnified, they must

22   cooperate with the law department.

23             I also know it is very interesting, Mr. Brustein was

24   just on trial, there was just a verdict against one officer

25   filed yesterday.  I printed it out.  I can hand it up.

HAHsPHOc

1  Mr. Brustein filed an application to Judge Chin in the Eastern

2  District asking to have the City be replaced in the judgment

3  instead of the individual officer against whom the liability

4  finding was set forth by the jury because the City is the real

5  party in interest.

6          THE COURT:  He wants a jury to know that?

7          MR. ROTHMAN:  Pardon me?

8          THE COURT:  He wants the jury to know that?

9          MR. ROTHMAN:  No.  This is after the judgment came in.

10         THE COURT:  I am talking about what the jury hears.

11  In this situation, we're not talking yet about building the

12  Gilla team.  However, there really is no cause to identify

13  beyond the jury selection.

14         Counsel is going to be identified as assistant

15  corporation counsel.  Beyond that, you don't refer to somebody

16  as the Paul Weiss lawyer or the lawyer from Mr. Rothman's

17  office.  You refer to the lawyer by name and that's enough, or

18  as defendant's counsel.  All right?

19         (Continued on next page)

20

21

22

23

24

25

HAH3FEEC2

1        MR. ROTHMAN:  I don't have a problem with that.  Just

2   in terms of the vernacular of how we, in this courthouse,

3   plaintiff's counsel, the Court, other people, refer to

4   assistant corporation counsel as city attorneys or they just

5   say what is the city's position on this.

6        THE COURT:  I may have to put myself in the guillotine

7   then if I do that, and it may happen.  But the fact of the

8   matter is, I'm granting the motion in limine to the extent that

9   you are to refer to them as defendant's counsel.  We're not up

10  to what happens if you should be subjected to the human

11  condition.

12       MR. ROTHMAN:  If I should be subjected to what?  I'm

13  sorry.

14       THE COURT:  The human condition.  If you make a

15  mistake.  I didn't get to that yet.  But, you may not refer to

16  counsel as the city's attorneys.

17       MR. ROTHMAN:  Okay.

18       THE COURT:  The implication is this is not about the

19  police officers, this is about the city.  They're the ones who

20  also pay the judgment.  That's the implication, and that's the

21  implication I'm not allowing you to make.

22       MR. ROTHMAN:  In that regard, your Honor, I will note

23  that the city is a defendant in the case for the state law

24  claims.

25       THE COURT:  You are allowed to refer to the city,

HAH3FEEC2

1    because they're a defendant.  They are a party in this action.

2    Fair.  I know.  I am on respondeat superior.  I got it.  You're

3    not planning on referencing indemnification correct,

4    Mr. Rothman?

5              MR. ROTHMAN:  So this issue comes up primarily --

6              THE COURT:  I'm shocked you're telling me that maybe

7    there is a possibility here that you want to do this.

8              MR. ROTHMAN:  As I was saying, so this comes up

9    primarily with regard to the issue of punitive damages.  What

10   I've put in there as an exhibit is a transcript from a hearing

11   in *Gyasi* before Judge Scheindlin.  When Judge Scheindlin said

12   she will not have a jury be misled to believe in any way, shape

13   or form that the punitive damages might come from the

14   hardworking officer's pocket who has a wife and children and

15   only makes X tens of thousands a year and has to put the kids

16   through school and all of that.

17             Opposing counsel has stated that he's not going to

18   bring up arguments about the officer's inability to pay.  I

19   appreciate that.  However, if your Honor bars any reference to

20   indemnification, your Honor should also bar the officer from

21   testifying that he has a wife or he has children.  He testified

22   he has four small children.  That statement alone seeps into a

23   jury's mind.  And the jury should not be left with what would

24   be an absolutely false impression.

25             THE COURT:  I'm going to put you all at ease here.

HAH3FEEC2

1    While I'm not going to express a view as to whether I think

2    Judge Scheindlin got it the right or got it wrong, I do plan to

3    bifurcate fact of punitive damages from amount of punitive

4    damages.  So, the jury will be asked the question whether the

5    conduct is outrageous or wanton or whatever the standard is,

6    sufficient that punitive damages should be awarded.  Yes or no.

7    And then we can have a second phase if the jury checks the

8    "yes" box on that.

9            MR. ROTHMAN:  I understand.  Even with regard to the

10   fact of punitive damages, if there is that misimpression by the

11   jury that the officer might have to pay out of his own pocket,

12   then that can affect significant --

13           THE COURT:  That's a question of opening the door.

14   The fact that something comes up in the course of this as to

15   whether your client has four children or their client has four

16   children, does not necessarily open a door here.  But, if, as

17   you say, the defendant, the defense counsel foolishly elicits,

18   by the way, let me ask you a question:  Would it be a burden

19   for you to pay a punitive damage award in this case, how would

20   that affect your family.  If they ask that question, I assure

21   you the door will be wide open, and you will be free to ask

22   away in response.

23           MR. ROTHMAN:  Understood.  Except imagine this set of

24   questions:  Are you married, officer?  Yes.  Do you have any

25   children?  Yes.  How old are your children?  Little Johnny is

HAH3FEEC2

1    two, little Suzy is four, little Billy is five, and he's

2    learning to ride a tricycle, and little Sally is seven.  Thank

3    you.  Just that alone, that alone.

4            THE COURT:  We're not going to hear about your client,

5    huh?

6            MR. ROTHMAN:  There is no cross claim against my

7    client.

8            THE COURT:  I didn't say that.  The jury is not going

9    to find out about your client, what she did, what her life is,

10   where she's been?  You are not going to get into that.  You're

11   just going to start the narrative with the day of this event.

12   And you are going to refrain from bringing out anything about

13   who she is, where she lives, how old she is, whether she's

14   married or single, or what she's ever done for a living; right,

15   Mr. Rothman?

16           MR. ROTHMAN:  No.

17           THE COURT:  Then I'm going to have the same rule apply

18   to the defendants.

19           MR. ROTHMAN:  It might be appropriate for me to not

20   question her about her daughter.  She has one daughter.  As a

21   matter of parity.  Though I will raise -- I'm sorry to cut you

22   off.  I don't wish to.

23           THE COURT:  I understand.

24           MR. ROTHMAN:  But there is this asymmetry of the

25   potential relevance to the background familial questions as

1    relates to the question of punitive damages, which only applies

2    to the defendant officer.  However, I do see your point.  And

3    it may be appropriate for me to agree to not inquire as to my

4    client about her children.

5              THE COURT:  Right now I'm not tying anybody's hands on

6    that.  Okay?

7              MR. ROTHMAN:  Very well, Judge.

8              THE COURT:  We'll see, and I'll rule on question by

9    question.  And you are not going to ask for a aspecific dollar

10   amount, correct?

11             MR. ROTHMAN:  I did not have any specific plan to, but

12   I don't wish to go into the trial being unable to do so, should

13   I choose to.

14             THE COURT:  Well, tell me why I should allow you to do

15   it since it's frowned upon in this circuit and a discouraged

16   practice.

17             MR. ROTHMAN:  It is frowned upon by some judges and it

18   is --

19             THE COURT:  I'm talking about the circuit.

20             MR. ROTHMAN:  They have declined to give a bright line

21   rule barring it, and they leave it to the good discretion.

22             THE COURT:  They certainly do leave it to the

23   discretion of the judge.

24             MR. ROTHMAN:  If your Honor's discretion is such as to

25   forbid it, then that will be understandable and I will adhere

HAH3FEEC2

1      to your Honor --

2              THE COURT:  That's my exercise of discretion, and I'm

3      sure you probably have a judge or two who has exercised their

4      discretion differently.

5              MR. ROTHMAN:  Yes.

6              THE COURT:  All right.  What is Officer Jurena's

7      tattoo?  What does it say?

8              MR. ROTHMAN:  We went into this at the deposition.  We

9      actually called your Honor and got a ruling.  I know you can't

10     believe it, but I think I actually aggravated you during that

11     call.

12             THE COURT:  I can't believe it.

13             MR. ROTHMAN:  So, your Honor, let me ask about the

14     tattoos that were visible on the date of the incident, which he

15     was wearing a short sleeved shirt.

16             THE COURT:  You wanted to ask about ones that weren't

17     visible.

18             MR. ROTHMAN:  What I said here, just to cut through

19     some of this, is I don't have any interest in asking about the

20     details of what is depicted.  That being said, a number of the

21     witnesses have specifically identified him as the person who

22     smashed into plaintiff based on the very prominent tattoos.

23             THE COURT:  Do you want to inquire at trial as to

24     those that were not visible?

25             MR. ROTHMAN:  I don't want to -- no.

HAH3FEEC2

 1            THE COURT:  So we can put those off the table, right?
 2    They're off the table.
 3            MR. ROTHMAN:  Yes.
 4            THE COURT:  So now tell me what the tattoos that were
 5    visible indicate.  Don't keep me in the dark.
 6            MR. ROTHMAN:  I won't.  But, I don't plan on asking at
 7    trial about the specific depiction, unless that comes up
 8    somehow in terms of the identification of the individual.
 9    There was one with a skull and one with a mermaid.  I'm not
10    interested in that.  I wanted to inquire into it at a
11    deposition as part of discovery.  But for trial I'm not.
12            But the fact that he has tattoos all over his arms,
13    and that's how the witness, particularly Reyes Santiago and one
14    witness Nicky Shapiro, who opposing counsel wishes to call,
15    identified him as the person who was interacting with her,
16    that's of course relevant.  And when the video is put on you're
17    going to see he has got visible tattoos all up and down.
18            THE COURT:  All right.  So what's the problem with
19    that?
20            MR. BRUSTEIN:  The problem with that, your Honor, is
21    not the fact that he has a tattoo or multiple tattoos on his
22    arm.  It's plaintiff should not be able to make arguments about
23    what those tattoos represent or what they mean.
24            THE COURT:  He just said he wasn't going to do that.
25            MR. BRUSTEIN:  He said he wasn't going to ask those

1   questions.  I want to make sure it's clear he won't make those

2   arguments.

3          THE COURT:  Ah-ha.  Mr. Rothman, were you planning on

4   not asking the questions but then raising it in your argument?

5          MR. ROTHMAN:  No.

6          THE COURT:  Okay.  So we're done on that.

7          MR. BRUSTEIN:  Yes, your Honor.

8          THE COURT:  Thank you.

9          MR. BRUSTEIN:  Thank you.

10          THE COURT:  Lawsuits or disciplinary histories, are

11   you planning on getting into any of that, Mr. Rothman?

12          MR. ROTHMAN:  Not unless they open door.

13          THE COURT:  Okay.  And what is the defendant concerned

14   about with regard to unrelated claims of police misconduct?

15          MR. BRUSTEIN:  In the news there's a lot of things on

16   a regular basis with Black Lives Matter, different types of

17   shooting incidents throughout the country.  There was the

18   stop-and-frisk litigation.  That is all, you know, papered

19   across the news and the internet.  And none of that should have

20   any place at this trial, your Honor.

21          THE COURT:  I don't think Mr. Rothman is planning on

22   getting into that, right?

23          MR. ROTHMAN:  Your Honor, I'm certainly not planning

24   on trying any other incident, but I haven't written my opening,

25   I haven't written my closing yet.  There is an important civic

HAH3FEEC2

```
 1     context into which the jury comes.  These are cases of enormous
 2     civic importance, and what they are doing is of enormous civic
 3     importance.  And it is in the context of these various things,
 4     that are known to everyone, that this case is taking place.
 5              I don't know how to respond.  Again, I don't want to
 6     go into a trial with my tongue tied.  If something comes up and
 7     I wish to make reference to something that occurs in the world
 8     we all share, in the society we all share, on opening or
 9     closing, that's not evidence.  If I cross a line, opposing
10     counsel can always object.  Your Honor can make a ruling at
11     trial.
12              But I don't wish to -- I don't wish to be muzzled
13     before I come in and before -- from referencing, I don't know
14     the full scope of what he's asking me not to reference.
15              THE COURT:  You don't think people should be able to
16     make motions in limine directed to openings and closing?
17              MR. ROTHMAN:  No, I do, but he hasn't given --
18              THE COURT:  I understand.
19              MR. ROTHMAN:  -- a specific delineation of what he
20     doesn't want me to say.  If I can mention Rodney King but I
21     can't mention Eric Garner.
22              THE COURT:  You can't mention either.  How is that for
23     starters.
24              MR. ROTHMAN:  That's clear.
25              THE COURT:  Now, this is a case of civic importance,
```

HAH3FEEC2

1    all cases alleging a civil rights violation are cases of civic

2    importance.  I grant you that.  But the only case this jury is

3    trying is this case.  This is not their opportunity to express

4    a view on what's going on in the world around them.

5              So, you may not refer to any actual or alleged

6    incident of police misconduct unrelated to this case.  All

7    right?  And if you have a desire to do so and you think my

8    ruling is overbroad, you can request a side bar and ask me if

9    you can refer to a specific matter.  And I will let you know.

10             MR. ROTHMAN:  Yes, thank you.

11             THE COURT:  With regard to the patrol guide, I don't

12   know how many times the city has to hear this, but I guess

13   you'll hear it again.  As the circuit has said, as I have said,

14   as I have charged juries, the jury will be instructed that a

15   violation of the patrol guide is not a violation of any

16   Constitutional standard, nor is compliance with the patrol

17   guide a justification for violating a Constitutional standard.

18             Allowing reference to be made to a patrol guide,

19   however, is a different story.  And I'm not going to wholesale

20   foreclose any evidence relating to a patrol guide, as long as

21   the jury understands that that is not the standard in this

22   case.  You can comply with the patrol guide and violate the

23   Constitution.  You can violate the patrol guide and not violate

24   the Constitution.  It is as simple as that.  All right?

25             What else?

HAH3FEEC2

1              MR. BRUSTEIN:  Just going back for a moment.  And this

2      is perhaps a belt and suspenders type of approach on my part

3      and I apologize.  But, with respect to the police misconduct

4      thing.  I understand your direction to plaintiff's counsel was

5      very clear, but there was one additional piece to that

6      referring to the terms testa-lying and blue wall of silence,

7      which ordinarily I might not think need to be explicitly

8      addressed, but I believe plaintiff in the opposition papers

9      specifically said that they wished to be able to use those

10     terms if they wanted to.

11             THE COURT:  How about saying, ladies and gentlemen,

12     you should consider whether Officer Smith is covering for his

13     colleague out of loyalty to a fellow police officer.  Is that

14     fair argument?

15             MR. BRUSTEIN:  I think that would also not be a fair

16     argument to just make because I don't believe that would be

17     based on anything in evidence of the record.  If there was

18     something brought out at trial to support it, but just the fact

19     that you're saying they're going to cover for another officer

20     out of loyalty.

21             THE COURT:  Then I probably should not charge the

22     jury, as I have in every civil case since I've been here, that

23     you can consider the hostility or affection that a witness may

24     have for a party in the case in assessing their credibility.

25     Because that sounds like that would run afoul of your view of

HAH3FEEC2

what's appropriate also.  But I do, and I plan to do so in this case.

So, I'm not making any ruling at this stage as to what one can say about potential bias of a witness.  It's fair game.  Colorful prose, we'll have to see what happens.  But I'm not making a ruling on that.

I'm going to set this case as the first backup to United States v. Bergstein, February 5, 10 a.m.  The docket no. of Bergstein is 16 CR 746.  You can follow it.  And I'm going to have you in for a conference at 3 o'clock on Friday, January 26, and the final pretrial conference in the Bergstein case is set for 2 o'clock.  So, if Bergstein is going as of 2 o'clock on January 26, then you will not go on February 5. Now it's possible that something could happen to Bergstein that could change things, in which event you'll go, and we'll let you know if that happens.

What else?

MR. ROTHMAN:  Your Honor, you ruled as to the toplessness issue with regard to the two violations in New Jersey.  I had made a broader motion in limine to bar opposing counsel from making any reference or argument concerning her history of topless activism.  I don't think it has anything to do with the case.

THE COURT:  I don't think it has anything to do with the case at all.  Let me hear from the defendant.  What does it

HAH3FEEC2

1    have to do with the case?

2              MR. BRUSTEIN:  Your Honor, the fact that plaintiff has

3    been topless by itself is not something that we're arguing.

4    Let me switch gears in my head.

5              I would submit that the fact that plaintiff has a

6    history of topless activism does speak to the First Amendment

7    chilling effect.  There is a retaliation claim that her speech

8    was chilled.  The fact that --

9              THE COURT:  Let's pause here.  Mr. Rothman, are you in

10   any way planning on suggesting to the jury that this officer

11   knew about the topless activism and was focusing on this

12   individual because he thought that was a very bad idea and he

13   wanted to punish her for it?

14             MR. ROTHMAN:  No, and nor are we suggesting that she

15   was inhibited from taking her shirt off as a response to what

16   the officer did.  We're not raising this issue at all

17   concerning her toplessness.

18             THE COURT:  Okay.

19             MR. BRUSTEIN:  I still think this goes to her -- the

20   chilling factor.  And I think this gets back to her prior

21   lawsuits and prior arrests for being topless.  I understand

22   your Honor's prior ruling.  I'm not trying to relitigate that.

23   However, the fact that she's been arrested, and, according to

24   her, treated in an inappropriate way because of her toplessness

25   and continued to be a proud topless activist to the point that

HAH3FEEC2

 1    she speaks about it in online interviews and is not shy about

 2    promoting her toplessness, does go to whether or not her speech

 3    is chilled.

 4            THE COURT:  Talk to me after the conclusion of the

 5    direct testimony of the plaintiff, and I'll see whether the

 6    plaintiff has opened the door on it.

 7            MR. BRUSTEIN:  Thank you, your Honor.

 8            THE COURT:  What else?

 9            MR. BRUSTEIN:  I'm sorry.  Can you repeat what the

10    final pretrial date was?

11            THE COURT:  Final pretrial conference -- I'll ask my

12    deputy.  I think it's 3 p.m. on January 26.  Is that correct?

13            THE DEPUTY CLERK:  Yes.

14            THE COURT:  Okay.  This case is jury selection and

15    trial three days or four?  Or about three or four?

16            MR. BRUSTEIN:  I would say three would be a good

17    estimate, your Honor.

18            THE COURT:  Mr. Rothman?

19            MR. ROTHMAN:  Sounds about right.

20            THE COURT:  Okay.  That's what I thought.  If for some

21    reason it comes to pass that I don't get you in on that date I

22    gave you, I will try to get you in as quickly as possible.  I

23    should be able to do that.  So I don't think it is going to be

24    a long wait.

25            MR. ROTHMAN:  Your Honor, just perhaps one request in

HAH3FEEC2

1   that regard.  I don't know if it is possible.  Opposing counsel

2   and I had spoken and we had proposed if your Honor was

3   available to start December 4.  The reason for that is I know

4   the plaintiff is planning on leaving the country some time

5   after the start of the new year and leaving indefinitely.  If

6   there is a trial date set and can't be avoided, I'll tell her.

7            THE COURT:  I can't do it then.

8            MR. ROTHMAN:  Okay.

9            THE COURT:  All right?  So let's stick with that plan.

10   And if something should change, then we'll act accordingly.

11   All right.

12            MR. ROTHMAN:  Thanks.

13            THE COURT:  Thank you all very much.

14            MR. BRUSTEIN:  Your Honor.

15            THE COURT:  Thank you for being well prepared so that

16   I can get to the heart of it.  Poor Mr. Rothman is used to my

17   style.  I think defense counsel is somewhat less used to the

18   style, although you were here for the summary judgment.

19            MR. BRUSTEIN:  Yes, your Honor.

20            THE COURT:  So I really admire well-prepared lawyers

21   like yourself.  And it enables me to get to the heart of

22   things, but trial work is not for amateurs.  You're both pros

23   and you both did very well putting up with the judge

24   interrupting you and asking questions that the judge viewed as

25   going to the heart of the matter, so I thank you very much.

HAH3FEEC2

1              MR. BRUSTEIN:  Thank you, your Honor.

2              MR. ROTHMAN:  Thank you.

3              (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25