UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
PHOENIX FEELEY,

            Plaintiff,     15-cv-8349 (PKC)

    -against-           OPINION AND
                     ORDER

THE CITY OF NEW YORK, et al.,

            Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

    This is a motion for a new trial by plaintiff Phoenix Feeley. Feeley proceeded to trial on claims of excessive force and First Amendment retaliation against an officer of the New York City Police Department ("NYPD") and against the City of New York on a respondeat superior theory premised upon related state law claims.[1] The jury found for defendants on both the excessive force and First Amendment claims. After judgment was entered, plaintiff moved for a new trial. Feeley argues that a decision of the Second Circuit, Edrei v. Maguire, 892 F.3d 525 (2d Cir. 2018), decided five days after the jury's verdict, together with an earlier case, Kingsley v. Hendrickson, 135 S.Ct. 2466 (2015), rendered the Court's instructions to the jury erroneous and prejudicial. For reasons that will be explained, the motion for a new trial is denied.

---

[1] Two defendants were named: Michael Jurena and the City of New York ("City"). The parties agreed that, if the plaintiff prevailed on the Section 1983 excessive force claim against Jurena, then the elements of the state law claim for battery would be satisfied and the City would be liable on a respondeat superior theory. In exchange for this concession by the City, plaintiff agreed that the fact that the City was a defendant would not be known to the jury.

THE INCIDENT

Before analyzing Feeley's legal claim, it is useful to review the evidence, which presented an only-in-New-York tale. Around 11:30 on the morning of July 24, 2014 on East 12th Street between Avenues A and B in Manhattan, a number of residents, including Feeley, moved their cars because of alternate side of the street parking rules and double-parked on the opposite side of the street. Feeley, a circus performer, lived about a half-mile from the spot. Feeley and other double-parkers intended to move their cars back to the other side of the street after street cleaning was completed. Feeley's car and those of other double-parkers blocked cars lawfully parked on the street.

One such blocked driver, Joseph Marthaler, was visiting from Sellersville, Pennsylvania. He asked a person in a nearby shop what he should do because his car was blocked. The person told him to beep his horn. Marthaler did. Feeley's car was not the car blocking Marthaler in; hers was a few cars away. When Marthaler beeped his horn, Feeley, who was seated in her car, exited and approached Marthaler's car. Feeley testified that "[a]nybody [she] witnesesd" was "mad at him" because of his annoying horn-honking. (Day Two Tr. 6.)

Feeley returned to her car to "grab a can of silly string." (Day Three Tr. 31.) She testified that she sprayed the "silly string" in the direction of the man's car. Marthaler testified that she sprayed the front and back doors on the driver's side of his car, as well as the roof. He testified that she "seemed out of control." (Id.) He said that when the can was empty she went back to her car and returned with a second can of silly string. At this point, Marthaler took a half-full paper container of coffee, left in his cup holder from the day before, and threw it at Feeley. Feeley testified that she was not physically injured by the thrown coffee. Marthaler called 911 because he "wasn't sure what she was going to do to my car next." (Id. at 32.)

Officer Michael Jurena of the NYPD and his partner, Officer Michael Ranieri, arrived and spoke with Marthaler. At some point, Jurena decided to clear the block of double-parked cars. "I wanted the block cleared because there was an incident that happened and I deemed it better to have all the cars go so the street cleaner can come by and there wasn't a group of people acting out, causing a scene and the street . . . cleaner can clean the street." (Day Two Tr. 131.)

Feeley testified she was telling Officer Jurena "that he wasn't doing his job, he wasn't protecting me, he wasn't keeping the coffee man from hurting somebody else, and that . . . I felt like he was just not wanting to do paperwork and then wasn't trying to like find justice or protect the community at all." (Day One Tr. 80-81.) She continued, "he was writing the ticket and then he said for me to move out of the way and I asked him why because there was no, like I didn't know where he would want me to go or why I had to move or, like what did he want from me. I had no idea. But before there was any answer or any time for any reaction, he barreled through me." (Id. at 83.)

She explained that it was "hard to say what part of his body hit me, but it was definitely like the right side, I guess like his chest area, arm area. I'm not a hundred percent sure." (Id. at 84.) She testified she was "jolted back . . . a few feet." (Day Two Tr. 62.) She neither fell to the ground nor hit the car. At the time of the incident, Jurena was approximately 5'9'' and 220 lbs., while Feeley was 5'2'' and 130 lbs.

Less than a minute after the incident, Feeley began a video recording. It shows a rather calm Jurena writing a ticket for double parking while Feeley speaks in an agitated tone, accusing Jurena of being an "asshole" who likes to "bully women." (Pl. Ex. D.)

Raymond Santiago, a Salsa musician who lives in the neighborhood, was called as a witness by Feeley. He was unable to confirm that there was any physical contact between Feeley and Jurena but could not exclude the possibility that there had been. He described how Feeley was standing in front of the "stickers," presumably her car's registration and inspection stickers, face to face with Jurena. He further explained that Jurena was trying to get to the spot where the stickers were: "[A]nd [Jurena] walks over and like, she moves out the way just in time, so I don't know if his right shoulder banged into her, but I know she was getting out of the way fast because he wasn't like, he wasn't saying excuse me. He was just walking pretty fast, doing his job, if that's what you want to call it." (Day One Tr. 32.)[2] When asked to describe Jurena's emotional reaction to what Feeley was saying, Santiago responded, "Well, he wasn't . . . paying any mind to whatever she was saying." (Id. at 34.) Santiago was standing about 6 or 7 feet away during the incident.

Feeley went to an emergency room where she was prescribed 400mg of ibuprofen and a muscle relaxer. She was also referred to an orthopedic practice for physical therapy. She attended one appointment at the orthopedic practice and did not return. Since she started working as a circus performer in 2004, Feeley had been seeing an acupuncturist at Acupuncture Body Works. About six months after the incident, she saw the acupuncturist for multiple reasons that included the consequences of the incident. She testified, "I always have things to maintain, so there was other things to work on that need maintenance in my body, so no, it was not just for what officer Jurena did." (Id. at 100.)

She testified that she was only able to take one circus engagement for the next two months that did not involve her arms or upper body. She was confronted at trial with a video

---

[2] Santiago testified differently at his deposition. He testified that the officer's body made contact with Feeley's left shoulder.

of her performing a "triple scorpion into a knee hang" about seven months after the incident. (Day One Tr. 112-14; Day Two Tr. 1-4; Def. Ex. 7.) This impressive feat involves three and one-half body flips using the arms, shoulders, and back muscles. She testified that she continues to experience pain from the incident with Jurena and submitted the medical records of her acupuncturist to verify this claim.

## FEELEY URGED THE COURT TO GIVE THE INSTRUCTION IN SUBSTANTIALLY THE FORM GIVEN

A recurring issue prior to trial was whether, viewed in the light most favorable to Feeley, there was a Fourth Amendment "seizure" by Jurena, as urged by Feeley,[3] or rather, a Fourteenth Amendment deprivation of due process through the use of excessive force, as urged by defendants. The Court ordered argument on the issue and concluded that summary judgment would be denied under either standard and directed the parties to submit proposed instructions under both standards. (July 6, 2017 Tr. 33-38.)

On October 4, 2017 Feeley filed a memorandum on the standard under which her excessive force claim should be analyzed. (Doc. 77.) While adhering to the principal position that the Fourth Amendment governed, Feeley's attorney asserted that, if the Fourteenth Amendment governed, Feeley's claim should be analyzed under the "shocks the conscience" standard and the four factors set forth in Johnson v. Glick, 481 F. 2d 1028 (2d Cir. 1973) ("Glick").

Again, adhering to the principal position that this was a Fourth Amendment "seizure" case, plaintiff Feeley submitted a proposed alternate instruction in the event that the Court concluded the claim should be analyzed under the Fourteenth Amendment:

---

[3] More fully, Feeley's argument was that the "seizure" was a violation of the Fourth Amendment as incorporated through the Fourteenth Amendment.

> Ms. Feeley contends that Defendant Jurena subjected her to the use of excessive force in violation of her rights as guaranteed by the Fourteenth Amendment to the United States Constitution. Force used by a police officer is excessive within the meaning of the Fourteenth Amendment <u>if it shocks your conscience as a jury</u>.
>
> In considering whether Defendant Jurena used force that <u>shocks your conscience</u>, and was therefore excessive, against Plaintiff you should consider the following four factors: [1] the need for the application of force, [2] the relationship between the need and the amount of force that was used, [3] the extent of injury inflicted, and [4] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. These are simply factors for you to consider in making your determination. None of these factors should be considered to be determinative. . . . As you have heard during the course of this trial, there is a stark factual dispute in this case as to whether or not Officer Jurena did, or did not, body check Ms. Feeley. If you find that Officer Jurena did intentionally or recklessly body check Ms. Feeley - which he denies having done - then you may find that he committed excessive force upon her in violation of the Fourteenth Amendment.

(Pl. Alt. Instr. No. 18; Doc. 75 at 30-31 (footnote and citation omitted) (emphasis added).)

The Court ultimately concluded that the encounter between Jurena and Feeley was not a seizure within the meaning of the Fourth Amendment but was instead governed by the Fourteenth Amendment based on <u>Rodriguez v. Phillips</u>, 66 F.3d 470, 476 (2d Cir. 1995). (May 24, 2018 Tr. 2-5.) That conclusion is not challenged on Feeley's post-verdict motion.

Early in the trial, the Court distributed Draft Jury Instructions (Court Ex. 3) that substantially tracked the language in Feeley's Alternate Instruction No. 18, quoted above. Defendants only offered one change, which the Court accepted over Feeley's objection. That change substituted the language "that Officer Jurena's actions shock the conscience" with "that Officer Jurena's actions were so egregious, so offensive as to shock the conscience." (Court Ex. 3 at 19; Court Ex. 10 at 18.)

In arguing against the "so egregious, so offensive" language at trial, Feeley's lawyer urged the Court to give the instruction "as is," including with the "shock the conscience" language, and reminded the Court that the instruction was his suggestion:

> The instruction about excessive force under the Fourteenth Amendment standard was taken by your Honor in at least significant part based upon the suggestion that I had made that came from Bogart v. City of New York. . . .[4]
>
> * * *
>
> I think the instruction is fine as is.

(Day Three Tr. 13-14.)

The Court instructed the jury in substantially the form proposed by Feeley with the one modification proposed by defendants. (Day Three Tr. 103-29).

NEITHER KINGSLEY NOR EDREI "ABANDONED" GLICK

    A. Kingsley v. Hendrickson

More than two years prior to trial, the Supreme Court decided Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015), which addressed whether a state actor's conduct should be assessed under a subjective or objective reasonableness standard. The Seventh Circuit below had held that a Fourteenth Amendment excessive force claim was governed by a "subjective inquiry" and that "[t]here must be an actual intent to violate [the plainitff's] rights or reckless disregard for his rights." Id. at 2471 (quotation marks omitted). The Supreme Court disagreed and held the case was governed by an objective standard of reasonableness. Id. at 2472.

---

[4] Bogart v. City of New York, 13-cv-1017 (NRB), 2016 WL 4939075, at *9 (S.D.N.Y. Sept. 6, 2016) (quoting the Glick standard.)

In rejecting the officer-defendants' assertion that this time-honored standard supported a subjective belief standard, the Supreme Court had occasion to discuss Judge Friendly's formulation in Glick:

> Nor does Glick provide respondents with significant support. In that case Judge Friendly, writing for the Second Circuit, considered an excessive force claim brought by a pretrial detainee under the Fourteenth Amendment's Due Process Clause. Judge Friendly pointed out that the "management by a few guards of large numbers of prisoners" in an institution "may require and justify the occasional use of a degree of intentional force." . . . He added that, in determining whether that intentional use of force "crosse[s]" the "constitutional line," a court should look: "to such factors as [(1)] the need for the application of force, [(2)] the relationship between the need and the amount of force that was used, [(3)] the extent of injury inflicted, and [(4)] whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." . . .
> This statement does not suggest that the fourth factor (malicious and sadistic purpose to cause harm) is a necessary condition for liability. To the contrary, the words "such . . . as" make clear that the four factors provide examples of some considerations, among others, that might help show that the use of force was excessive.

Id. at 2475-76. Kingsley, fairly read, did not reject the Glick formulation, although it mentioned a total of six factors that may be relevant to consider. Rather, it rejected the officers' argument that Glick supported a subjective standard. Further, Kingsley did not address the "shock the conscience" language found in Glick.

The Kingsley Court found the trial court's instruction to be erroneous because it required the plaintiff to show that the officers "recklessly disregarded [Kingsley's] safety" and that the officers "acted with reckless disregard of [Kingsley's] rights," which "suggested the jury should weigh respondents' subjective reasons for using force and subjective views about the excessiveness of the force." Id. at 2476-77.

B. Edrei v. MacGuire

Feeley argues that the Second Circuit's decision in Edrei v MacGuire, 892 F.3d 525 (2d Cir. 2018), a Fourteenth Amendment excessive force case decided five days after the jury's verdict, rendered this Court's instructions erroneous. Edrei was an interlocutory appeal from the denial of qualified immunity and the Second Circuit's jurisdiction was limited to the narrow question of whether qualified immunity was established as a matter of law. Id. at 529. In Edrei, the officer-defendants argued that Kingsley arose in the context of a pretrial detainee, and as such, its holding ought not be extended to non-detainees present at a demonstration. The Second Circuit disagreed and extended Kingsley's holding to non-detainees. Id. at 535-36.

Far from overruling Glick, the Circuit, like the Supreme Court in Kingsley, found that the law enforcement defendants were distorting the meaning of Glick. Id. at 533-34. The Circuit rejected the notion that the "shocks the conscience" standard incorporated a subjective intent element and viewed Glick as identifying "four illustrative factors for assessing whether conduct . . . 'shocks the conscience.'" Id.

Notably, the Edrei Court did not agree that Kingsley implicitly rejected the "shock the conscience" standard. The Circuit's opinion explained as follows:

> As the Supreme Court has observed [in Kingsley], "the measure of what is conscience shocking is no calibrated yard stick"; it merely "point[s] the way." . . . Mindful of this indefiniteness, Kingsley is best read as elaborating on this standard, not abandoning it. . . . To put a finer point on it, Kingsley teaches that purposeful, knowing or (perhaps) reckless action that uses an objectively unreasonable degree of force is conscience shocking.

Id. at 536 (citations omitted) (footnote omitted).

Edrei, which was an appeal from the denial of a pre-answer motion to dismiss on the grounds of qualified immunity, offers helpful guidance to district courts presented with

Fourteenth Amendment excessive force claims. But it would be an overread of Edrei to construe it as holding that it is error to charge a jury with Glick's "shock the conscience" formulation. Edrei relied upon Kingsley and, as Edrei explicitly noted, Kingsley did not "abandon[]" the "shocks the conscience" language. Instead, Edrei replaces Glick's non-exhaustive four-factor standard with Kingsley's non-exhaustive multi-factor standard and wisely suggests that the "shock the conscience" language may have become unnecessary because force that is objectively unreasonable is conscience-shocking.

NO NEW TRIAL IS REQUIRED

To the extent that Feeley argues this Court's instruction was erroneous based on Kingsley, this Court's disagrees. The instruction was consistent with Kingsley because it did not require Feeley to prove that Jurena intended to violate a federally-protected right. Instead, the instruction focused on whether Jurena's acts were done recklessly or intentionally, as distinguished from accidentally or by mistake. Specifically, the charge required Feeley to prove that "Officer Jurena acted intentionally or recklessly and that those acts deprived her of rights, privileges, or immunities secured by the Constitution." (Day Three Tr. 114 (emphasis added).) In other words, Feeley was required to "show that those acts that [the jury] found the defendant took under color of state law caused her to suffer the loss of a federal right and that in performing those acts, the defendant acted intentionally or recklessly." (Id. at 115 (emphasis added).)

Even if this Court's instruction to the jury was erroneous based on Kingsley, any error was invited error. See United States v. Wells, 519 U.S. 482, 488 (1997) ("[A] party may not complain on appeal of errors that he himself invited or provoked the [district] court to . . . commit."). Indeed, Kingsley was decided more than two years before the trial, and it was

Feeley's Alternate Instruction 18, utilizing the "shocks the conscience" formulation, that was the basis for the Court's instruction to the jury.

Feeley does not fair any better if Edrei is viewed as controlling precedent on the formulation of jury instructions. Plain and simple, Feeley never sought an instruction on the Fourteenth Amendment claim that included the concept of objective unreasonableness and no instruction was given. The one part of the jury instruction to which Feeley made a timely objection had little to do with its present argument that "objective unreasonableness" should have been charged and that "shock the conscience" should not have been charged. Specifically, Feeley objected to the change of language from "that Officer Jurena's actions shock the conscience" to "that Officer Jurena's actions were so egregious, so offensive as to shock the conscience." (Court Ex. 3 at 19; Court Ex. 10 at 18.) The defendants' requested modification, accepted by the Court, was rooted in County of Sacramento v. Lewis, 523 U.S. 833, 848 n.8 (1998) and Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008). At trial, Feeley took the position that the instruction—with the "shock the conscience" language but unadorned by the additional but inconsequential embellishment—was "fine as is." (Day Three Tr. 14.) An objection to the "so egregious, so offensive" addition did not amount to an objection to the Court's overall instruction. Rule 51(c)(1), Fed. R. Civ. P. ("A party who objects to an instruction . . . must do so on the record, stating distinctly the matter objected to and the grounds for the objection.").

When a party fails either to request a jury instruction to object to an instruction given, the instruction may be reviewed for plain error "if the error affects substantial rights." Rule 51(d)(2), Fed. R. Civ. P. The plain error doctrine "should only be invoked with extreme caution in the civil context." Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 18 (2d Cir.

1996).  "To constitute plain error, a court's action must contravene an established rule of law" and the substantial right affected must "go[] to the very essence of the case."  Rasanen v. Doe, 723 F.3d 325, 333 (2d Cir. 2013) (quoting Lavin–McEleney v. Marist Coll., 239 F.3d 476, 483 (2d Cir. 2001) and Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994)).

The Court's instruction did not "contravene an established rule of law."  While Feeley never sought and the Court did not instruct on objective unreasonableness, it is equally true that the Court never instructed the jury to consider Officer Jurena's subjective belief that his actions were lawful.  The jury was instructed that Jurena's acts must have been intentionally or recklessly done.  In other words, the acts could not have been the product of accident or mistake.  Further, the Court instructed that the acts must shock the jury's conscience, not Officer Jurena's conscience.  The Court also instructed that the jury could consider (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, and (3) the extent of injury inflicted—all objective considerations.  The fourth Glick factor, upon which the jury was instructed at Feeley's express request, was "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Though this fourth factor is a subjective consideration, the jury was also told that "[t]hese are simply factors for you to consider in making your determination.  None of these factors should be considered to be determinative."  Moreover, both Kingsley and Edrei declined to find the existence of this fourth factor a fatal defect in the Glick standard.  See Kingsley, 135 S. Ct. at 2476 ("This statement does not suggest that the fourth factor (malicious and sadistic purpose to cause harm) is a necessary condition for liability.  To the contrary, the words 'such . . . as' make clear that the four factors provide examples of some considerations, among others, that might help show that the use of force was excessive."); Edrei, 892 F.3d at 537

(citations omitted) ("Turning to the fourth Glick factor, whether the force was applied 'maliciously and sadistically for the very purpose of causing harm,' . . . Kingsley explained that this is not a 'necessary condition for liability,' . . . . Instead it is simply one consideration 'that might help show that the use of force was excessive.").

Further, the fact that this Court's instruction did not include the concept of objective unreasonableness hardly constitutes plain error that affects a substantial right of a party. Indeed, Edrei made plain that it was only making a "modest refinement" of the Glick standard:

> Although we now hold that Kingsley provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment, it bears emphasizing that this new formulation is but a modest refinement of Glick's four-factor test, on which this Court has long relied.

Edrei, 892 F. 3d at 537. This Court concludes that the failure to charge this "modest refinement" does not meet the plain error standard.

A new trial is, therefore, not warranted because the Court's "shock the conscience" instruction, even if error, did not "affect the substantial rights of the parties" and, thus, the judgment based upon the verdict is not "inconsistent with substantial justice." See Nat'l R.R. Passenger Corp. v. One 25,900 Square Foot More or Less Parcel of Land in the City of New London, 766 F.2d 685, 688 (2d Cir. 1985) (citations omitted) ("As a general rule, we will . . . grant a new trial because of an error in the jury instructions only if . . . the error was prejudicial. . . . [A] judgment should stand unless it appears inconsistent with substantial justice because it followed from an error that affected the substantial rights of the parties.").

CONCLUSION

Plaintiff Feeley's motion for a new trial (Doc. 106) is DENIED.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
January 23, 2019